## UNITED STATES v. VENUTO.
### No. 10069.

United States Court of Appeals
Third Circuit.

Argued March 7, 1950.

Decided May 29, 1950.

John M. Smith, Jr., Philadelphia, Pa. (Joseph Moss, Philadelphia, Pa., on the brief), for appellant.

Gladstone P. Lillicrapp, Asst. U. S. Atty., Philadelphia, Pa. (Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, HASTIE, Circuit Judge, and LEDERLE, District Judge, sitting by designation.

LEDERLE, District Judge.

This is an appeal from a judgment of conviction and sentence after trial by a jury on a four count indictment charging defendant with willfully and knowingly attempting to defeat and evade some $34,000 in individual income taxes for the calendar years 1942 to 1945, inclusive, in violation of Section 145(b) of the Internal Revenue Code, 26 U.S.C.A. § 145(b).

Defendant asks for judgment of acquittal or, alternatively, a new trial, claiming that the Government failed to establish any taxable deficiency beyond a reasonable doubt, that he was deprived of his constitutional right to consult with his counsel during trial, and that the trial court erred in the admission of evidence, in restricting closing arguments, and in his charge to the jury.

Defendant entered the United States from Italy in 1923 at the age of twenty-three. He has spent the intervening twenty-seven years in Philadelphia. He is a butcher by trade, and was so employed with various meat dealers in Philadelphia from 1923 to 1941. He started working in Philadelphia for $3 a week, and was associated with meat dealers at progressively advancing compensation until he opened his own meat store in 1941.

During the prosecution years, 1942-1945, defendant rented and occupied a three-story building, where he operated a retail meat store on the first floor and resided above. Prior to 1942, defendant acquired eight pieces of income-producing property. In 1942, he purchased a slaughterhouse in Philadelphia for $9500. In 1943, he acquired an additional piece of property for $3400, and in 1944, two additional pieces of property for $30,000. Most of these acquisitions were paid for outright by check.

During the four years in question, defendant's income was derived from operation of his retail meat store and slaughterhouse and from rental income on the properties previously mentioned. He maintained no books of account other than check stubs.

Evidence was introduced tending to prove that all receipts from defendant's slaughterhouse, meat store and rentals were deposited regularly and currently in four bank accounts in Philadelphia, and all expenses were paid therefrom by check. Counsel stipulated that these four bank accounts showed deposits totalling $1,009,535.35 for the four years. Counsel also stipulated that third party records and defendant's check stubs showed that defendant's purchases of merchandise bought for sale were understated nearly one-half in his tax return for each year in question. Stipulated actual purchases for the four years aggregated approximately $825,000. Reported purchases approximated $450,000.

Government agents testified that they reconstructed defendant's income picture for the years in question in the following manner. They analyzed the bank accounts and defendant's check stubs and cancelled checks, verifying through third party suppliers, actual purchases of merchandise bought for sale. As to real estate income, this was verified through statements of receipts and disbursements prepared by the real estate firm which managed all of defendant's real estate business and remitted monthly to defendant net income after de-

ducting expenses and commission. The agents determined that bank deposits constituted business receipts except for some $18,000 of non-income items for the four years. For each year in question, these non-income items were first deducted from the respective annual bank deposits. The balance was considered gross business receipts, from which the actual stipulated meat purchases were deducted. No change was made in any other expense deductions appearing in defendant's returns, as to which full credit was allowed as claimed. Upon such reconstructed income figures, the tax deficiencies were computed. The following tabulation shows the discrepancy between the Government agents' computations and those reported in defendant's returns as to gross business receipts less purchases of merchandise bought for sale.

*Government Figures*

|  | 1942 | 1943 | 1944 | 1945 |
|---|---|---|---|---|
| Gross receipts | $192,523.81 | $273,071.57 | $331,210.78 | $172,100.00 |
| Stipulated purchases | 164,121.14 | 245,231.62 | 287,025.72 | 128,113.69 |
| Net Balance | $ 28,402.67 | $ 27,839.95 | $ 44,185.06 | $ 43,986.31 |
| *Reported* Gross receipts | $101,168.42 | $131,261.40 | $175,170.31 | $117,713.58 |
| Purchases | 85,421.80 | 110,612.39 | 145,580.93 | 99,252.87 |
| Net Balance | $ 15,746.62 | $ 20,649.01 | $ 29,589.38 | $ 18,460.71 |

Defendant took the stand and testified that his sole source of income was from the meat businesses and rental of properties, and that all receipts from these enterprises went into these bank accounts.

■ Since we are of the opinion that a new trial must be ordered on other grounds, we do not feel that it is proper at this time to analyze various phases of the testimony pointing to guilt. Suffice it to say that this record contains evidence from which a jury could conclude beyond a reasonable doubt that during the prosecution years defendant had businesses of a lucrative nature, that he made periodic deposits in, and withdrawals from, bank accounts, that the difference between such deposits and withdrawals reflected current income, and that there was a substantial understatement in reporting income. Such proof meets the requirement of the so-called bank deposit method of reconstructing a taxpayer's income picture, and would be legally sufficient to support a verdict finding that there was a substantial tax deficiency for each of the prosecution years, which defendant knowingly and willfully attempted to defeat and evade. See: Gleckman v. United States, 8 Cir., 1935, 80 F.2d 394, certiorari denied 297 U.S. 709, 56 S.Ct. 501, 80 L.Ed. 996; Stinnett v. United States, 4 Cir., 1949, 173 F.2d 129, certiorari denied 337 U.S. 957, 69 S.Ct. 1531, 93 L.Ed. 1756; Paschen v. United States, 7 Cir., 1934, 70 F.2d 491.

This trial lasted four days. The records upon which the prosecution was predicated were voluminous. Near noon of the second day, the Government closed its case, and defendant took the stand. His direct examination was completed late in the afternoon, and cross-examination commenced immediately. The court excused the jury at 4 o'clock, and thereupon stated: "I would like to say to counsel, I do not want to keep this man in custody overnight—he is now committed for cross-examination so he will not discuss this case with anybody. Otherwise, I will have to commit him." In the ensuing discussion, similar and more explicit directions were given by the trial judge to the effect that defendant and his counsel were required to bind themselves not to consult together during this eighteen hour overnight recess at this crucial point of the trial or the court would revoke defendant's bail and commit him to jail incommunicado so that no consultation would be possible. Yielding to the court's ultimatum, the vow of silence between accused and his counsel was given and fulfilled. Twice while defendant was on the stand, the court announced short recesses, and admonished the defendant to remain seated and "have no discussion with your counsel or anybody else." No such injunction was imposed upon any other witness during the trial.

■ We recognize the necessity for reposing in a trial judge a reasonable discretion in the matter of restricting persons in the court room so that proceedings may be conducted in an orderly manner; but, as

announced in Glasser v. United States, 315 U.S. 60, 71, 62 S.Ct. 457, 465, 86 L.Ed. 680: "Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused."

■ To deprive an accused defendant and his counsel of the right to consult with each other during an eighteen hour court recess was most certainly deprivation of the defendant's constitutional right to consult counsel at all stages of the proceeding. We can find no justification for imposing a restriction of silence between accused and counsel during a trial recess. We reject the Government contention that defendant and his counsel must prove affirmatively the exact prejudice produced by this injunction in a federal prosecution. Not only would this require them to disclose what would have been privilged communication between attorney and client, but, as stated in Glasser v. United States, supra, 315 U.S. at page 76, 62 S.Ct. at page 467: "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." By restricting the right of consultation between this defendant and his counsel during court recesses, defendant was denied the right to have the assistance of counsel for his defense, as guaranteed by the Sixth Amendment to the Constitution. His objection on this ground and his motion for mistrial directed to the trial court were well founded. Accordingly, the conviction must be reversed and a new trial granted.

The defendant offered proof tending to show that he was illiterate, able to read or write little beyond his own name, and that the entire task of his account keeping and tax reporting was performed by one Frederick Grun, who prepared checks and income tax returns for defendant's signature without any instructions to understate income. Mr. Grun was identified by various witnesses as an itinerant bookkeeper, who was regarded as somewhat of an oracle in the Italian section of South Philadelphia, where he traveled throughout the day from one meat dealer to another, combining his accounting services, for which he charged little, with his main business of selling insurance to these merchants. It is defendant's position that, if there was an understatement of income, the sole responsibility therefor rests with Grun, that defendant neither knowingly nor willfully participated therein, and that to the extent the Government was defrauded, defendant likewise was misled by Grun, upon whom he relied to properly perform the accounting duties.

The defendant testified that he entrusted practically all his check writing to Grun, either signing checks prepared by Grun, or signing checks in blank so that Grun could complete them for payment of defendant's expenses. He also testified that a check signed by him in blank for payment of expenses had been fraudulently completed by Grun to his own order in the amount of $2000, and that this defalcation was not known to defendant until he was questioned about it by Government agents making this income tax investigation. Defendant testified that he had trusted Grun implicitly, and, upon learning of this check, he had forthwith discharged Grun as his accountant and had reported the matter to the District Attorney for prosecution, for which reason hostility existed between him and Grun. Grun was subpoenaed by both the Government and defendant, was in the court room each trial day and was identified by various witnesses, but was not called to the stand.

■ During his closing argument, defendant's counsel was in the process of arguing to the jury that, because of hostility over this $2000 check, defendant couldn't rely upon Grun to testify truthfully, which was the reason Grun had not been called by defendant to corroborate his testimony that Grun and not defendant was the only one who had knowingly understated defendant's income. At this juncture, counsel was stopped by the court, his remarks ordered stricken, and, when counsel objected, he was admonished not to continue this line of argument. In his charge, the court stated to the jury: "Counsel for the defendant quite dramatically told you that there was a bookkeeper employed by the defendant and that

the entire responsibility was his by reason of the ignorance and lack of reading, writing, and complete understanding of the defendant's responsibilities. You may recall that he asked Mr. Grun to stand up, and a man stood up, and he called the man to your attention there in the third row. That was the last heard of Mr. Grun, and you haven't heard from him, nor has the Court or anybody else since that time. Members of the jury, you will have to draw your own inference from that." Counsel's line of argument was properly predicated upon a reasonable inference that might be drawn from evidence which defendant had introduced. It was error to strike and restrain such argument. This being true, a fortiori it was prejudicial error for the court in charging the jury to suggest an opposite analysis of the same set of circumstances, as was done in the quoted portion of the charge.

█ One of the Government agents testified to his preparation of a net worth statement of defendant's assets and liabilities. However, upon cross-examination, he admitted that he did not have data as to defendant's liabilities and that a net worth statement could not be prepared without such data. The Government conceded that it was not relying upon the net worth theory to prove its taxable deficiency, and that such net worth statement had not been used in computing the deficiency.

Defendant's motions to strike the testimony as to this net worth statement should have been granted, and defendant's objections to Government agents' subsequent references to such statement should have been sustained because the statement was not relied on and was concededly unreliable under the principles enunciated in U.

S. v. Fenwick, 7 Cir., 1949, 177 F.2d 488, and Bryan v. U. S., 5 Cir., 1949, 175 F.2d 223. wherein a Court of Appeals reversal ordering new trial on the sole ground of insufficiency of evidence was affirmed in 338 U.S. 552, 70 S.Ct. 317, as against defendant's contention that judgment of acquittal was mandatory.

This error in permitting Government witnesses to continue referring to such statement was not cured by the trial court's statement in his charge. Undoubtedly, the repeated reference to the statement indelibly imprinted it upon the minds of the jurors, and charging the jury that the statement was legally defective *"if you so find"* [1] further clouded the picture by making the jurors finders of law as well as fact.

One of defendant's specifications of error relates to a claimed unresponsive and misleading answer given to the jury by the trial court upon a written question presented by the jury during its deliberations, which read: "Please find out whether the amended tax was because of certain deductions which were not allowed or for what other reason for the two years the amended tax was collected." The question was not too explicit, but apparently what it asked for was a statement as to the differences between original and amended returns for two years,[2] all of which were exhibits. Should this situation arise in the re-trial, the jury could be instructed to make its own comparison of the documentary exhibits.

We have examined the cases cited by the Government, and will not burden this opinion with a discussion thereof other than to say that they are distinguishable.

The judgment will be reversed and the cause remanded for a new trial.

1. Emphasis added.

2. For the two years when amendments were filed, the deficiencies were based upon the amended rather than original returns.