UNITED STATES of America,
Plaintiff-Appellant,

v.

Sidney A. BRODSON, Defendant-Appellee.

No. 11648.

United States Court of Appeals
Seventh Circuit.

Feb. 7, 1957.

Duffy, Chief Judge, and Finnegan, Circuit Judge, dissented.

See, also, 234 F.2d 97.

Edward G. Minor, U. S. Atty., Howard W. Hilgendorf, Asst. U. S. Atty., Milwaukee, Wis., Charles K. Rice, Asst. Atty., John J. McGarvey, Attorney, Criminal Section, U. S. Department of Justice, Washington, D. C., for appellant.

John L. Palmer, David E. Beckwith, Milwaukee, Wis., for appellee.

Opinion of the Court on Rehearing, En Banc.

Before DUFFY, Chief Judge, and FINNEGAN, LINDLEY, SWAIM, and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Plaintiff appeals from an order entered by the district court which *inter alia* sustained defendant's motion to dismiss an indictment charging defendant with willful attempted evasion of his income tax for each of the years 1948 to 1950 inclusive, in violation of section 145(b) of the Internal Revenue Code of 1939.[1] Prior to the return of the indictment, a

1. 26 U.S.C.A. § 145(b).

jeopardy assessment was made and tax liens were filed against the defendant in the amount of $342,120.37 for income taxes and additions thereto for fraud, plus interest, for the years 1945 to 1950, inclusive.

In a bill of particulars, the government indicated it intended to prove the allegations in the indictment by the net worth and expenditures method.

The pertinent grounds of defendant's motion to dismiss are that the initiation of a criminal prosecution for tax evasion during the pendency of a jeopardy assessment and accompanying tax liens deprives him of liberty and property without due process of law and the effective assistance of counsel for his defense, in violation of the Fifth and Sixth Amendments to the United States constitution, and specifically that defendant will be unable to get a fair trial and will be deprived of assistance of counsel for his defense, because the jeopardy assessment and liens prevent him from using his assets to insure adequate preparation for trial and representation at the trial. Affidavits were submitted by each side.

The defendant argued in support of the motion that, as a result of the pending jeopardy assessment and tax liens, he was without funds to defray the expenses of his defense, particularly to engage the services of an accountant to aid in meeting the government's net worth proof. The district judge indicated that, if defendant filed an affidavit as to his financial inability and if the government did not then see fit to release the tax liens in part and to place a reasonable amount of defendant's assets in escrow with the clerk of the court for the purpose of defraying the expenses of the defense, he would be inclined to the view that defendant was being deprived of his constitutional right to a fair trial. Such an affidavit was filed. The government informed the court that it was without authority in law to release any part of the assets subject to the tax liens.

In granting the motion to dismiss, the district court held defendant could not, in the court's opinion, effectively refute the government's evidence without the extensive assistance of a trained accountant.

Defendant contends that under the circumstances the district judge "has the authority and duty to dismiss the indictment", because the prosecution of this case "denies to defendant due process of law and effective assistance of counsel guaranteed to him by the Fifth and Sixth Amendments to the United States constitution."

Citing the cases of Powell v. State of Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 and Avery v. State of Alabama, 1940, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377, Rule 17 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., 23 A.L.R. 1382, and 54 A.L.R. 1225, he contends that "at each step in the process of attempted conviction, safeguards are erected to insure an honest and fair trial, even for the ignorant and the pauper." He adds that in this case we have "an attempt by the government not only to infringe these rights and destroy these protections, but to strip from the defendant all financial means for preparing an adequate defense, and this is being done in an action which the United States Supreme Court has recognized contains many pitfalls and ensnarements. Holland v. U. S., 1954, 348 U.S. 121, 75 S. Ct. 127, 99 L.Ed. 150."

He quotes from Rochin v. People of California, 1952, 342 U.S. 165, at page 173, 72 S.Ct. 205, 208, 210, 96 L.Ed. 183:

"* * * Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.' * * * * "

Defendant states that the Powell decision rejects the premise that the Fifth and Sixth Amendments impose mere formal, rather than substantive, standards. He asserts that the right guaranteed by the Sixth Amendment is an absolute right, relying upon Betts v. Brady, 1942, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256,

86 L.Ed. 1194 and Johnson v. Zerbst, 1938, 304 U.S. 458, 467, 58 S.Ct. 1019, 1024, 82 L.Ed. 1461.

In each of the cases thus cited by defendant the court was reviewing a final judgment of conviction. He has cited no case and we have been unable to find a case in which any court has held that a trial to be held at some time in the future will not be a fair trial and hence dismissed an indictment without a trial. The nonexistence of such a decision is probably because no judge has ever undertaken on such a motion to forecast what will occur at a trial. On the other hand, in retrospection with knowledge of what has occurred at a criminal trial, a court would be in a position to apply to the facts thus established, any applicable constitutional requirements. No court possesses the prescience to effectively apply those principles to presently unascertainable facts. Perhaps the futility of such an attempt at anticipation cannot be illustrated more aptly than by considering the circumstances existing in the case at bar.

It is not unreasonable to assume that events happening between the entry of the order, from which this appeal was taken, and a trial on the merits may remove or make irrelevant the alleged present financial inability of defendant to procure an accountant. In fact, defendant's affidavit presages the possibility of the occurrence of events any one of which might solve the difficulty in which defendant says he is involved. His affidavit shows that, since the jeopardy assessment was made and the tax liens filed, he borrowed to pay debts, insurance premiums and living expenses. He listed fourteen loans totaling $17,482.58 made from April 14, 1952 to December 31, 1954. Included in the list is an advancement of $1,000 on August 27, 1954, by Martin Brill to Lipton, an attorney retained by defendant.[2] The other lenders are unidentified. In view of the fact that these sources of financial relief were available to defendant despite the pendency of the jeop-

ardy assessment and liens, the possibility of further financial relief from such sources cannot be ignored. These transactions took place despite the contention of defendant's counsel that the assessment and liens prevent such transactions.

Furthermore, if needed, an accountant might volunteer before the trial to assist defendant's counsel, one of whom did suggest by letter to the district judge several accountancy firms who might be requested so to act. Also some friend may gratuitously furnish defendant with the services of an accountant.

Again, the presentation of the government's case upon a trial may reveal that the services of an accountant are wholly unnecessary. For instance, a substantial increase in defendant's assets during the taxable years in question might be shown to be the result of a gift, an inheritance, or other nontaxable acquisition. Certainly any competent tax attorney could present such evidence without the assistance of an accountant. Defendant since his indictment has been represented by lawyers skilled particularly in the field of income tax law. Palmer, one of his present counsel, stated in an affidavit that he has since October 1949 devoted himself primarily to income taxation law and been engaged in a number of "net worth" cases. Attorney Lipton stated by affidavit that he was an attorney in the office of the Chief Counsel, Internal Revenue Service, for about 10 years and handled many cases, and, in addition thereto, he has been engaged exclusively in the practice of tax law since December 1, 1950, handling *inter alia* criminal income tax cases. Lipton selected and employed an accountant to work in this case, for whose work he paid $800. The relevancy and adequacy of that work can be determined only on a review of a conviction where a court can come to grips with the question of whether defendant received a fair trial.

Whether defendant is correct in his contention that the constitution re-

2. Lipton afterwards withdrew as defendant's attorney, prior to the court's appointment of defendant's present counsel.

quires that one indicted for income tax evasion is entitled to the services of an accountant to assist his attorney in a case where the government intends to rely upon the net worth theory, we do not now decide. However, we think it is obvious that there is no such requirement invariably and as a matter of law in every such case. If there is such a constitutional requirement at all, a defendant's right to invoke it must depend upon the particular circumstances of his case. A consideration of these circumstances must necessarily encompass the occurrences at the trial. Of course, such occurrences can be judged only in retrospect, as in a review of defendant's conviction, if he is convicted. What occurred at the trial would then be known as a certainty, and a correct result could be reached either upon a motion in the trial court to set aside the verdict of conviction or in a court reviewing a judgment based on such a verdict. It is illogical for a court to speculate in advance of a trial on the question of whether a defendant will or will not receive a fair trial without the assistance of an accountant. Neither can a court bolster the results of its speculation by reading affidavits of persons not subjected to cross-examination under oath. It is not sound policy for a district court to summarily dispose of an indictment and free a person charged with crime by resolving a question of fact without the taking of evidence, particularly where the fact relates to a future event.

Defendant calls for the establishment of such a policy because the preparation "and analysis of a defendant's financial history involves and requires not only legal techniques but also accounting skills and techniques." He indicates that "the need for expert accounting assistance is the primary one in the effective prepara-

tion of defense". It is apparent that defendant is seeking not merely the services of an expert witness but the services of an expert accountant who is to be used in preparation and analysis of defendant's financial history and in assisting his counsel at and before the trial of his case.[3] Such a policy, if now established, would as a matter of consistency be subject to extension to experts in other fields—psychiatrists, ballistics experts, chemists, physicians, and an unlimited number of other specially trained persons. It is this natural consequence of such a policy which, in addition to the reasons above stated, dictates that, if established, it must be based upon a record containing the actual proceedings at a trial, rather than the inferences drawn from pretrial affidavits.

Inasmuch as it is a fact that only by a post-trial study of the whole case can it be determined whether defendant's constitutional rights to a fair trial will be violated, it is well to point out that it may never be necessary to decide that question. The necessity may be obviated by defendant's plea of guilty, his acquittal, a dismissal of the indictment on motion of the government, a directed verdict, or the death of the defendant. All of these possibilities emphasize that the court should not on a pretrial motion prematurely decide the constitutional questions raised by defendant. The court must cross the bridge when and if it gets to it. It should not exercise its power in resolving, in the shadow of a hypothesis, a controversy which it may, in the light of reality, justly and completely settle in the future, when and if the occasion arises.

 In defendant's brief it is admitted that a jeopardy assessment may be levied without violating constitutional rights.

---

**3.** Actually defendant does not limit his requirements to expert accounting assistance in the preparation of his defense. His attorneys initimate that they must interview witnesses living in all parts of the country and defendant cannot defray the expenses incidental thereto. They also speak of long distance telephone calls. No doubt a court-appointed attorney might, under such a policy, be furnished with stenographic and investigational services, additional office space and many other incidentals to the practice of law, insofar as germane to the defense of the case.

His counsel then seek to make a distinction between a simple case of an indigent defendant and the case of a "defendant who has been *rendered indigent* by the state [sic], who is kept in this position by the state's refusal to have the defendant's tax liability determined by a court of law, and who, while in this position, is faced with losing his freedom in a criminal prosecution for tax fraud." The distinction is without validity. If constitutional guarantees preclude the prosecution of a defendant who because of indigence is unable to employ lay experts of his own choosing, the manner in which the defendant is rendered indigent is immaterial.

Inasmuch as the only question before us at this time is that of the propriety of the order of the district court, and inasmuch as we have no jurisdiction to decide, in advance of a decision of the district court, questions which may arise in the future, for the reasons stated we reverse the order dismissing the indictment and discharging defendant's bail bond and remand the cause, without prejudice to the right and power of the district court to conduct further proceedings not inconsistent with the views herein expressed and to take such appropriate action as may be deemed necessary and proper in this proceeding, having due regard to the rights of both the government and the defendant.

Reversed and remanded with directions.

DUFFY, Chief Judge (dissenting).

As a member of the panel of this Court which first heard this case, I filed a dissenting opinion. I reaffirm the statements made therein, but see no necessity for repeating that opinion here.

The Government levied a jeopardy assessment on October 26, 1951. This assessment was for a sum of $100,000 greater than the claimed assets. The notice of deficiencies was dated December 11, 1951. The civil action in the Tax Court was commenced March 7, 1952. Defendant was not indicted until April, 1953. Defendant insisted the civil case be tried first. It had been pending more than a year before the indictment herein was returned. The Government successfully resisted all efforts to bring the civil action to trial. Such a trial would have clearly demonstrated whether accounting services were necessary for the defendant in the criminal case. The result of such a trial would have abated the jeopardy assessment.

Here the Government, by its deliberate act, by a jeopardy assessment, captured the defendant's assets and thus denied him the use of his own funds to defend himself; the tools of defense were taken from him; the Government pauperized him by placing him in a financial straight-jacket.

Due process of law requires that convictions cannot be brought about by methods that offend a sense of justice. Rochin v. People of State of California, 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183. As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. Lisenba v. People of State of California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166. The tactics of the Government in this case in preventing defendant from utilizing the necessary tools of defense certainly offends my sense of justice. There were no elements of fairness present in the Government's tactics.

The tactics of the Government in this case also were a violation of defendant's rights under the Sixth Amendment which provides that a defendant is entitled to have the assistance of counsel for his defense. The denial of effective assistance of counsel also violates due process. Powell v. State of Alabama, 287 U.S. 45, 58, 53 S.Ct. 55, 77 L.Ed. 158. This right to the effective assistance of counsel entitled the defendant to a reasonable opportunity to defend. In re Oliver, 333 U.S. 257, 275, 68 S.Ct. 499, 92 L.Ed. 682.

The conduct of the Government in this case violates those canons of decency and fairness to which any defendant in a criminal case is entitled under the Fifth and Sixth Amendments of the Constitu-

tion of the United States. It is my judgment that the trial court was justified under the peculiar circumstances of this case, in dismissing the indictment before trial.

FINNEGAN, Circuit Judge (dissenting).

My initial position separately stated in United States v. Brodson, 7 Cir., 1956, 234 F.2d 97, 100 remains unchanged. Now I am recording my views on current phases of the appeal because the court retained jurisdiction, and recently I participated at the *en banc* hearing granted subsequent to three separate opinions handed down, (United States v. Brodson, 7 Cir., October 31, 1956, No. 11648) by a panel which heard oral arguments after the motion to transfer was first denied.

Of course the correctness of the ruling below is the question before us, but when it now and currently is said "we have no jurisdiction to decide, in advance of a decision of the district court, questions which may arise in the future," I part company with the majority. The fallacy embedded in the quoted statement is generated by circular reasoning. Jurisdiction is disavowed by tacitly classing the situation as premature [1] and the situation is rated as premature so that the conclusion will reflect lack of jurisdiction.

This record is replete with investigation, affidavits, documents and conferences utilized [2] by the district judge before he finally ruled. See e. g. 234 F.2d 97. Allowing another bite at the judicial apple in the district court evades solution of a serious question squarely facing us today.

---

1. From the record (T. R. 115) the trial judge appeared alert to such a point, e. g., "The Court: What will transpire on the trial which will give the court more information than is before the court now in affidavit form?"

"Mr. Hilgendorf (Assistant United States Attorney): I would like to come to that point * * *."

After reading roughly 150 printed pages of record and substantial briefing I have yet to find when and where the "point" was reached.

Following the oral argument on October 17, 1955, defendant filed three affidavits as to his inability to finance the preparation of his defense. (R. 88, 96, 107). These uncontroverted affidavits establish, *inter alia,* the following:

1. The levying of jeopardy assessments and tax liens on October 29, 1951, immediately rendered the defendant insolvent. (R. 89).

2. This insolvency has been continuous. (R. 89).

3. In the absence of said levies and liens, defendant would be solvent. (R. 89).

4. As a result, defendant lacks funds to finance effective preparation of his defense. (R. 89).

5. No person, firm or corporation holds any money or assets not known to the government as agent or trustee for the defendant and/or subject to his control or withdrawal. (R. 89, 100, 108–109).

6. As a result of defendant's inability to pay fees and disbursements, defendant's former attorney withdrew from the case. (R. 65, 89).

Defendant's court-appointed counsel filed an affidavit on October 24, 1955, stating that the services of skilled certified public accountants were necessary in the preparation and trial of this case. (R. 91). This fact is uncontroverted. (R. 141). Following the filing of defendant's first affidavit (R. 88) and of his counsel's affidavit (R. 91) on October 25, 1955, Judge Grubb invited the United States Attorney to make any objections to the affidavits. (R. 93). By letter filed November 1, 1955, the United States Attorney propounded six questions relating to defendant's first affidavit (R. 94). In reply defendant filed such an affidavit on November 7, 1955 (R. 96).

On November 8, 1955, Judge Grubb invited criticism of said affidavit by the government. (R. 101). On November 10, 1955, the United States Attorney and the District Director of Internal Revenue filed affidavits. (R. 102, 105). The latter states that the sum of $78,244.41 had been levied upon and that the affiant was holding other assets, not as yet reduced to cash. On November 10, 1955, defendant filed a third affidavit relating to his financial condition.

On November 17, 1955, the United States Attorney advised that the Internal Revenue Service could not and would not release funds to the defendant under existing law. (R. 109).

The salient part of the order brought here for review provides:

"3. The defendant's motion of August 15, 1955, to dismiss the indictment upon the grounds that the initiation of a criminal prosecution for tax evasion during the pendency of a jeopardy assessment and accompanying liens deprives the defendant of liberty and property without due process of law, in violation of the Fifth Amendment to the United States Constitution, and to the effective assistance of counsel for his defense, in violation of the Sixth Amendment to the United States Constitution be and it hereby is granted and the indictment be and it is hereby dismissed."

A reading of the district judge's opinion, reported as United States v. Brodson, D.C.Wis.1955, 136 F.Supp. 158, brings into clear focus his reasons for dismissing the indictment. They ought not to be lightly cast aside by a remand from this level. Under Rule 12, Fed. Rules of Criminal Procedure pre-trial motions, such as Brodson's, are addressed to the sound discretion of the lower court. Takeguma v. United States, 9 Cir., 1946, 156 F.2d 437. I am satisfied that the constitutional questions raised by Brodson could be considered prior to the introduction of evidence on the issues presented by the indictment.

I would define our problem within the framework of organic law, "In *all* criminal prosecutions, the accused shall * * have the *Assistance* of Counsel for his defence" U. S. Constitution, Amendment VI. Recurring to such an elementary principle, perhaps, suggests that the drafters of the Constitution were neither confronted with income tax fraud prosecutions nor the accountants' syllogism called "the net word theory." But

the inescapable interpretation problem presented by this appeal must be answered in the context of modern society. The Amendment's word "assistance" is the key. Fortunately there is more than a trace of the belief held by judges, lawyers and treatise writers that fair play in criminal cases is not altogether an outlandish notion.[3] Yet experience has demonstrated that the label "criminal" tied to a human being before conviction all too frequently blurs vision and judgment of enforcement and administrative officers. One need only recall the pathetic humorless statement of a prosecutor to a "badman"—"after a fair trial we will hang you."

Mr. Justice Sutherland speaking for the majority in Powell v. State of Alabama, 1932, 287 U.S. 45, 57, 53 S.Ct. 55, 59, 77 L.Ed. 158 on the point (coming from the state level, to be sure) of denial of the right to counsel and opportunity for trial preparation, said:

"In any event, the circumstance lends emphasis to the conclusion that during perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, *when* consultation, *thorough-going investigation and preparation* were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself." (Italics added.)

I am well aware of the Powell court's own limitation, 287 U.S. 45, 71, 53 S.Ct. 55, of what it considered as the question for decision. Yet I cannot read the passage quoted as completely estranged from the decision point. That the prosecution's brief tells us of an inability to

**3.** Griffin v. People of State of Illinois, 1956, 351 U.S. 12, 76 S.Ct. 585, 100 L. Ed. 891; Frank, Administration of Criminal Justice, 1953, 15 F.R.D. 95, 101; Bliss, Defense Detective, 47 J.Crim.L. & Crim.P.S. 264 (1956); A.L.I. Model Code of Evidence, Rule 403 (1942).

See Donnelly's review of Beany, The Right to Counsel in American Courts, 64 Yale L.R. 1089, 1094 (1955); Cross, "The Assistance of Counsel for his Defense". Is This Becoming a Meaningless Guarantee? 38 A.B.A.J. 995 (1952).

locate any case where "it has been held that the services of a lay expert are essential to the effective assistance of counsel" is unavailing. We are considering constitutional principles, not examining metes and bounds descriptions for a title to pasture land.

A similar thread runs through Glasser v. United States, 1942, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 in the frequently quoted line: "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."

There are many concepts of the word "assistance." They range from judicial notions expressed in cases involving parties to crime and the attendant problems of accessorial liability, to Old Age Assistance. When examined in connection with the constitutional guaranty, courts have reversed convictions despite the physical presence of a law license holder at the defendant's side. United States v. Venuto, 3 Cir., 1950, 182 F.2d 519; United States v. Bergamo, 3 Cir., 1946, 154 F.2d 31.

The district judge was right, in my opinion, for rejecting Rule 28, Federal Rules of Criminal Procedure, 18 U.S.C., as an escape hatch.[4] What was said in Coplon v. United States, 1951, 89 U.S. App.D.C. 103, 191 F.2d 749, 759 supplies a clue: "These cases [collected in the opinion] unequivocally establish the principle that the two Amendments guarantee to persons accused of crime the right *privately* to consult with counsel both before and during trial. This is a fundamental right which cannot be abridged, interfered with, or impinged upon in any manner." Rule 28 follows:

"The court may order the defendant or the government or both to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint witnesses of its own selection. An expert witness shall not be appointed by the court unless he consents to act. A witness so appointed shall be informed of his duties by the court at a conference in which the parties shall have opportunity to participate. *A witness so appointed shall advise the parties of his findings*, if any, *and may thereafter be called to testify by the court or by any party.* He shall be subject to cross-examination by each party. The court may determine the reasonable *compensation* of such a witness and direct its *payment out of such funds* as may be provided by law * *."

(Italics added.)

Even if I am unduly optimistic and assume there are funds provided by law to compensate experts, there is nothing showing in this record that the government auditors would approve a voucher submitted by an expert failing in rendering services to both sides. In short, I am troubled by the mandatory word "shall" in Rule 28 and, doubting the practicality of the prosecution's offer to waive disclosure to it of the expert's findings[5] "before the trial" (Brief for U. S. p. 5), would say the district judge correctly ruled.

"Wilfulness" is one of the critical elements in prosecutions under I.R.C.1939, § 145(b), 26 U.S.C. § 145(b). That mental factor is inextricably interwoven into evidence demonstrated by the net worth *theory*. Though the Supreme Court in Holland v. United States, 1954, 348 U.S. 121, 139, 75 S.Ct. 127, 137, 99 L.Ed. 150, approved the view that wilfulness "cannot be inferred from the mere under-

---

4. In its brief at page 18, the Government makes this concession:

"We submit that Rule 28 gives the court broad power to appoint expert witnesses, including an accountant, in a crim-

inal tax case if such testimony is deemed necessary."

5. The implications found in Himmelfarb v. United States, 9 Cir., 1949, 175 F.2d 924, are not complete answers to the problem shaped by his appeal.

statement of income," certainly the impact of net worth evidence on a jury is devastating even when independent proof is absent. Substantial unexplained increases in net worth require detailed analysis, and unless the defense is aware of them, and can combat this contemporary progeny of an application of funds statement, the result may be disastrous. But it requires a competent accountant aiding the defense to pick its way among such evidentiary rubble in these cases. For example, an experienced attorney has pointed out, Avakian, Net Worth Computations as Proof of Tax Evasion, 10 Tax L.R. 431, 448–449 (1955): "But the first big inroad on the doctrine that tax evasion requires proof of an evil motive is likely to come in the area of net worth prosecutions. This is due to the fact that a net worth computation glosses over the question of intent. Technical adjustments are usually eliminated in a 'specific item' case, not so much out of consideration for the defendant as from fear that defense counsel may exploit the non-fraudulent items to his advantage. * * * After all, the bigger the net worth 'bulge,' the greater the chance of conviction."

While I do not accept statements simply because they appear in law reviews or journals, what has just been quoted does point up a fragment of the problem confronting defense counsel in these cases. If society merely wants automatic convictions then a hamstrung defense will facilitate achievement of that shabby aim, but if society desires that courts engage in a search for truth, before punishing, then I would avoid being stingy with defense materials.

Holland v. United States, 1954, 348 U.S. 121, 125–127, 75 S.Ct. 127, 130–132, 99 L.Ed. 150 manifests some awareness of the current and forces influencing the adjudicatory process when the net worth theory supplies buoyancy for the prosecution's case:

"Nevertheless, careful study indicates that it [net worth theory] is so fraught with danger for the innocent that the courts must closely scrutinize its use. * * *

"* * * the method requires assumptions, among which is the equation of unexplained increases in net worth with unreported taxable income. Obviously such an assumption has many weaknesses. * * *

"* * * There is great danger that the jury may assume that once the Government has established the figures in its worth computations, the crime of tax evasion automatically follows. The possibility of this increases where the jury, without guarding instructions, is allowed to take into the jury room the various charts summarizing the computations; bare figures have a way of acquiring an existence of their own, independent of the evidence which gave rise to them. * * *

"When there are no books and records, willfulness may be inferred by the jury from that fact coupled with proof of an understatement of income. But when the Government uses the net worth method, and the books and records of the taxpayer appear correct on their face, an inference of willfulness from net worth increases alone might be unjustified, especially where the circumstances surrounding the deficiency are as consistent with innocent mistake as with willful violation. On the other hand, the very failure of the books to disclose a proved deficiency might indicate deliberate falsification."

A charge to the jury, in my opinion, resplendent in law, logic, and learning could not repair the ravages of an unfair trial. In substance, the district judge reasoned to the conclusion that the complicated nature of the case to be presented against Brodson would render a trial engaged in by inadequately equipped defense counsel so likely to result in "injustice as to be fundamentally unfair." His view is predicated upon a searching

analysis of the situation[6] at first hand. By stating we are intellectually unequipped with "prescience," as the majority claims, to cope with this one little set of facts, implies that the trial judge is similarly disabled. I disagree. This is an unusual case, to be sure yet, paraphrasing Mr. Justice Frankfurter speaking for the majority in Rochin v. People of State of California, 1952, 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183, this situation is not a sport in our constitutional law but an application of general principles. What the Rochin court majority, 342 U.S. 165, 173, 72 S.Ct. 205, 210, pointed up, has significance here:

> "Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice' * * * * ."

Of course Rochin arose on the state level and required squaring with the Fourteenth Amendment, yet I think the following theme helpful in this appeal:

> "The faculties of the Due Process Clause may be indefinite and vague, but the mode of their ascertainment is not self-willed. In each case 'due process of law' requires an evaluation based on a disinterested inquiry pursued in the spirit of science, on a balanced order of facts exactly and fairly stated, on the detached consideration of conflicting claims * * on a judgment not *ad hoc* and episodic but duly mindful of reconciling the needs both of continuity and of change in a progressive society."
> 342 U.S. 165, 173, 72 S.Ct. 205, 209.

The jeopardy assessment involved here was levied before August 14, 1953, hence the abatement provision of § 6861(g), Internal Revenue Code of 1954, 68A Stat. 834 was unavailable. Regs. 105, Section 81.74; 1955–1: T.D. 6126, Cum.Bull. 466

6. Burns and Rachlin, Trial by Net Worth, 33 Taxes 121 (1955); Lipton, Current Problems in the Tax Fraud Field, 1955 Wis.L.R. 416 (1955).

(1955), 26 Code Fed.Regs. §§ 39.273, 39.273–1 (1956). To this extent the present appeal differs from cases arising on jeopardy assessments made after August, 1953.

If the statute of limitations were not lurking in the background of this case, I dare say the prosecution's interest might have long since flagged. But I refuse to let the threat of time expiration deter me from the key issue. I would affirm.

The Bill of Particulars (T. R. 25 to 28) show that "additions to income are determined on the net worth and expenditures method."