**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael J. FINK and John A. Geders,**
**Defendants-Appellants.**

No. 73–3966.

United States Court of Appeals,
Fifth Circuit.

Oct. 7, 1974.

Rehearings Denied Dec. 6, 1974.

Ralph W. Rinehart, Tampa, Fla., for defendants-appellants.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Oscar Blasingame, Anthony J. LaSpada, Asst. U. S. Attys., Tampa,

Fla., Harrison T. Slaughter, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before MOORE,* AINSWORTH and RONEY, Circuit Judges.

MOORE, Circuit Judge:

This is an appeal by John Geders and Michael Fink from a judgment of conviction by the United States District Court for the Middle District of Florida, the Hon. Ben Krentzman, *Judge,* entered pursuant to a jury verdict. Appellants were convicted on all three counts of an indictment charging them with: (a) conspiracy to import approximately one thousand pounds of marijuana into the United States in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 371; (b) illegal importation of said marijuana into the United States; and (c) possession of marijuana in violation of 21 U.S.C. § 841(a)(1).

The government alleged that appellants Geders and Fink conspired with seven others, Rufus Randolph Surles, Jr., James M. Mahoney, Randy Kilgore, Fred Fink, Steven Patrick, Tom Waddington (now deceased) and David Butler, to smuggle marijuana into this country by air from Columbia, South America, via Inagua, The Bahama Islands. According to the prosecution, the plot germinated in September 1972 when John Geders, Randy Kilgore and Michael Fink concluded that together they possessed the wherewithal to smuggle a large quantity of marijuana into this country. Geders agreed to provide a South American "contact" or drug supply while Fink promised to find financial backing for the venture. Randy Kilgore assured the others that he would make arrangements with a knowledgable and trustworthy pilot who would be able and willing to fly the cargo of drugs into the United States undetected.

Michael Fink made good on his promise. He introduced James M. Mahoney and Tom Waddington to the scheme, and they agreed to supply the necessary capital. After a few false starts, Randy Kilgore found David Butler, a pilot with access to a Piper Aztec aircraft, who was willing to make the trip to Colombia for a $10,000 fee plus expenses and fifty pounds of marijuana. Additional conspirators also emerged. Rufus Randolph Surles, Jr., agreed to provide a trailer, of the type normally used by vacationers on camping trips, to which the marijuana could be transferred once it was landed. Steven Patrick agreed to drive the camping trailer.

In David Butler the other conspirators found not only an able pilot but also a man who seemed well versed in the lore of the smuggling business. On several occasions Butler alluded to his prior experience in the field. He advised his employers to land the marijuana-laden plane at Lehigh Acres, an abandoned housing development near Tampa, Florida, and made other helpful suggestions with respect to the details of the illegal importation. He suggested reentry into the United States via the Bahama Islands where he claimed to have the customs officials bribed; he suggested that the other conspirators, when meeting the plane at the time and place of unloading, should be equipped with walkie-talkies for communication with the plane and should carry roofing nails to strew in the path of would-be pursuers.

Early Sunday morning, November 26, 1972, David Butler, John Geders and Jim Mahoney boarded Butler's rented plane and took off for Colombia, South America. On the return trip, after stopping at Inagua, the plane landed at the pre-arranged location near Tampa. The marijuana was transferred from the plane to the camper which left the landing site escorted by Randy Kilgore and Michael Fink. The caravan did not get far, however, because federal agents soon closed in. Steven Patrick, the driver of the camping trailer filled with marijuana, was immediately apprehend-

---

* Hon. Leonard P. Moore, Senior Circuit Judge for the Second Circuit, sitting by designation.

**4**

ed. Kilgore and Fink eluded immediate capture but were eventually arrested.

It seems that this well orchestrated scheme never really had a chance for success. The authorities had been informed of the group's plans far in advance by the pilot, David Butler. For his help in thwarting the smuggling attempt, the United States Customs Service agreed to permit Butler to retain the fee paid to him by the other conspirators.

The trial of the conspirators began on October 9, 1973.[1] Prior thereto Randy Kilgore and Steven Patrick pleaded guilty to a single conspiracy count and agreed to testify for the prosecution. Although David Butler was indicted along with the others, the government moved to dismiss the charges against him and the court granted the motion.

As their primary defense at trial, appellants Geders and Fink argued that they had been entrapped by Butler, the government informer. Not only did he assist them in the furtherance of the importation scheme but, according to appellants, Butler induced them to commit the crime and had been paid to do so by the government who hired Butler as a sort of modern day bounty hunter. As a matter of fact, appellant Geders who was traveling in the plane with Butler on the trip from South America, claims that when the plane landed in Inagua before its reentry into the United States he was informed by a native that Butler appeared to be working with the police. After the plane was again in the air, Geders tried to persuade Butler to slow the plane down so that he and Mahoney could dump the marijuana into the sea. Butler ridiculed Geders' apprehensions and refused to permit anyone to unload the contraband until designated rendezvous was made.

· The government, on the other hand, insisted that Butler had, at all times, merely assisted a plot which had begun before he entered the picture, and that anything he did which appeared to further the conspiracy was done to gain the confidence of the conspirators, a permissible objective in undercover police work.

The entrapment defense was presented to the jury which, nevertheless, returned a guilty verdict.

On this appeal appellants urge that fourteen separate errors were made in the court below which singly or together compel reversal of the convictions rendered by the jury. Many of the claims raised by the appellants are frivolous and warrant no discussion in this court. Efficiency demands that many of the remaining questions be treated in combination.

I.

·Appellants have broadly attacked the district court's handling of the entrapment issue. They argue: that the government should have been prohibited from introducing unflattering evidence with respect to defendant Geders' reputation; that the defense was unfairly barred from either ascertaining the events upon which this reputation was based or introducing rebuttal character testimony after the prosecution had attacked defendant Geders' reputation; and that the government's participation in the smuggling enterprise through its avowed agent, David Butler, was so pervasive and so critical to the consummation of the crime that any prosecution of the appellants is unconscionable.

Throughout the trial appellants placed substantial reliance on an entrapment defense, *i. e.*, on the argument that they were reluctant participants in a criminal scheme engineered by a government agent who, for reasons of financial gain, had employed a "tremendous sales pitch" to overcome appellants' natural antipathy toward the commission of illegal acts.

The purpose of the entrapment defense is to inhibit the use of

---

1. Defendant James M. Mahoney was granted a severance and his case was tried separately.

pressure tactics by the government which cause the commission of an offense *by one who is not ordinarily disposed to commit it.* *See* Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1939). Naturally, the defense is not readily available to one who has evidenced an inclination to commit the type of offense with which he is charged. The government, therefore, once a defendant indicates his reliance on the entrapment defense, is permitted to tender evidence on the defendant's predisposition to commit the type of crime charged.

In this case the prosecution introduced Charles Hudson, a federal Narcotics Agent, who testified that he had talked to confidential informants and had examined intelligence files in the Hillsborough County, Florida, Sheriff's Office and had thereby ascertained that defendant Geders had a reputation in his community as a drug smuggler and distributor. When the defense asked to see the files on which the witness' testimony was based or to be given reference to the specific events contained therein, it was rebuffed by the court which admonished the defense that it would be contrary to the rules of evidence for the prosecution to admit evidence of the specific acts of defendant Geders which gave rise to his unsavory reputation.

■ It has long been the rule in this Circuit that "reputation" or "character" evidence can be introduced by the government to rebut an entrapment defense. In fact, it has been specifically held that reputation evidence of the sort introduced in this trial is permissible.

We have repeatedly held that once the defense of entrapment is raised the government may introduce hearsay testimony concerning the defendant's predisposition to commit the crime and the reasonableness of the conduct by the government agents. Washington v. United States, 5 Cir., 1960, 275 F.2d 687; Rocha v. United States, 5

Cir., 1968, 401 F.2d 529; Thompson v. United States, 5 Cir., 1968, 403 F.2d 209. Moreover, in the case of Thompson v. United States, supra, this court specifically approved the use of reputation evidence in the form of testimony which the witness gleaned from the reports of a local police department. United States v. Robinson, 446 F.2d 562, 563–564 (5th Cir. 1971).

■ Not only was the trial court correct in admitting Agent Hudson's testimony, it was also well within established principles when it refused to permit the defense to question the witness about the specific events or activities of defendant Geders that gave rise to his adverse public image. Character reputation is established not by what one knows to be fact concerning another, but by what one has heard in the community about the person in question. Michelson v. United States, 335 U.S. 469, 482, 69 S.Ct. 213, 93 L.Ed. 168 (1948). Thus, evidence of specific acts or conduct is not admissible to prove or disprove the reputation that a defendant holds in his community. Stewart v. United States, 70 App.D.C. 101, 104 F.2d 234 (1939).

Defendant Geders also argues that after this evidence with respect to his reputation was introduced by the prosecution, he was forbidden from rebutting it, or at least attenuating its impact, by introducing favorable reputation evidence. In fact, all that actually happened was that the court refused to grant the defendant a continuance, after Agent Hudson testified, so that he might search for character witnesses of his own. Defendant Geders argued that he needed the continuance because Agent Hudson's testimony was of an unexpected and surprising nature.

■ It is well settled that once a defendant indicates his intention to rely on an intrapment defense, the prosecution can be expected to prove, if it can, that the defendant had a predisposition to commit the type of crime of which he stands accused. In this Circuit predisposition can be demonstrated by evi-

dence that in his community the defendant had the reputation of one who committed a particular type of illegal act. Such evidence can by no stretch of the imagination be considered surprising or unexpected.

In view of the prevailing case law, Agent Hudson's testimony did not introduce a new issue and the decision whether or not to grant a continuance to the defense under the circumstances was well within the discretion of the trial judge. He did not abuse that discretion.

Finally, appellants argue that, all things considered, the government's conduct was so unconscionable that the prosecution ought to be dismissed. In making this argument appellants put great emphasis on the testimony of John Geders who stated that on several occasions subsequent to leaving the Bahamas on their return to this country, he and co-defendant James Mahoney attempted to persuade Butler, the police agent and pilot, to slow down so that they might jettison their illicit cargo. According to Geders, Butler refused. Thus, as the defense tells it, the defendants, through Geders and Mahoney, had renounced their criminal enterprise and were attempting to disassociate themselves from it.

This is, of course, simply another way of saying that the defendants were entrapped by the government into the commission of the crimes charged. This argument had already been presented to the jury with great force and we see no reason to interfere with the jury's evaluation of it—something that we could do only if we found that the jury had acted upon insufficient evidence or improper instructions. Neither ground is present here. The jury was undoubtedly persuaded by the uncontested fact that once the plane landed all the defendants present, including Geders, took part in transferring the cargo of marijuana to the waiting camper. This course of action seems completely inconsistent with defendant Geders' tale of renunciation and entrapment.

## II.

Appellants' second major contention is that their defense efforts were hamstrung by the trial court's refusal to afford them its assistance in their attempts to obtain adequate pre-trial discovery. On numerous occasions the defendants asked the court to order various prosecution witnesses to submit themselves for deposition or, at the very least, to order these witnesses to discuss the facts of the case with the defense attorneys. Their pleas were consistently and, according to appellants, unfairly rebuffed. Appellants argue that the court's refusal to compel discovery left them "deaf, dumb and blind, and totally unable to formulate a proper defense . . ." and constituted a denial of fundamental fairness.

Appellants concede that there is no provision in the Federal Rules of Criminal Procedure, nor anywhere else, that specifically directs the trial court to order prosecution witnesses to give depositions to the defense or to submit themselves to pre-trial oral interrogation at the hands of defense counsel. Nevertheless, appellants argue that such action by the trial court, which is not inconsistent with those rules, is vital to the maintenance of procedural fairness as that principle is embodied in the Federal Constitution.

The constitutional status of the right of a criminal defendant to depose witnesses was settled, at least in this Circuit, in United States v. Hancock, 441 F.2d 1285, 1286–1287 (5th Cir.), cert. denied, 404 U.S. 833, 92 S.Ct. 81, 30 L. Ed.2d 63 (1971), where Chief Judge Brown wrote:

Initially Hancock [the defendant] alleges error of constitutional dimensions by asserting that the Trial Court's denial of his motions for a list of government witnesses and a discovery order *for the purpose of taking their depositions* violated his rights under the Fifth and Sixth Amendments. . . . [W]ith the scope of discovery in criminal prosecutions

narrower than it is in civil cases, Campbell v. Eastland, 5 Cir., 1962, 307 F.2d 478, 487, cert. denied, 371 U.S. 955, 83 S.Ct. 502, 9 L.Ed.2d 502, and in the absence of a rule which permits the taking of depositions of witnesses who will appear at the trial of a criminal case, we cannot say at this juncture that such a procedure has yet been elevated to a constitutional plane even though some states have seen fit to adopt it.

(Emphasis supplied).

Moreover, appellants' arguments notwithstanding, at least one Circuit Court of Appeals has held that Rule 16(b) of the Federal Rules of Criminal Procedure forbids a trial court from ordering those who will serve as witnesses for the prosecution to submit to defense deposition. *See* United States v. Conder, 423 F.2d 904, 910 (6th Cir. 1970).

█ The general view, however, is that, with the exception of capital cases,[2] the question of the extent of defense discovery, at least that discovery which requires judicial assistance, is a matter within the discretion of the trial court. United States v. Richter, 488 F.2d 170, 175 (9th Cir. 1973). That discretion is not easily abused. "Denial of a motion to take a deposition is . . . reviewable on appeal from a judgment of conviction but defendant has a heavy burden to show an abuse of discretion by the trial court, and no defendant thus far has prevailed on such an appeal." C. Wright, I Federal Practice and Procedure § 242, at 482 (1969).

█ In exercising its discretion the trial court must weigh a variety of factors. For instance, it must balance the need of the accused for the depositions requested against the possibility that prospective witnesses might be harassed or intimidated as a result of their submission to the discovery process. United States v. Cole, 449 F.2d 194, 198 (8th Cir. 1971), cert. denied, 405 U.S. 931, 92 S.Ct. 987, 30 L.Ed.2d 806 (1972).

█ In this case there was clear evidence that the defendants were capable of harassment. One of the conspirators, who at trial testified as a witness for the prosecution, stated that appellant Geders carried a gun during the smuggling operation which he intended to use against David Butler if he sensed that Butler intended a double-cross. Furthermore, that same witness, Randy Kilgore, expressed his fear that his decision to testify for the prosecution might mark him or the members of his family for some act of revenge by the other conspirators. Under the circumstances we cannot say that the trial judge abused his discretion when he refused to order prosecution witnesses to submit themselves to defense deposition or to order them to discuss the case with counsel for the defense.

Finally, appellants claim that reversible error resulted from the court's refusal to interfere with the policy of the United States Customs Service which prohibits its agents from discussing the facts of pending cases with defense counsel without the permission of the United States Attorney.

█ Appellants' argument is well taken to the extent that tradition forbids the prosecution from ordering its witnesses to refuse to answer pre-trial inquiries made by the defense. Canon 39 of the old Canons of Professional Ethics of the American Bar Association and Canon 10 of the Code of Trial Lawyers state that: "A lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal action without the consent of opposing counsel or party." However, there is no evidence that the trial court failed to apply the law in this case. When defense counsel reported to

2. 18 U.S.C. § 3432 requires that in capital cases the defendant be furnished a list of the names and addresses of the witnesses to be called by the government. The special status of pre-trial discovery in capital cases is discussed in Gregory v. United States, 125 U.S.App.D.C. 140, 369 F.2d 185 (1966).

the court that Federal Agents Buchanan and Christenberry refused to speak with the defense without the permission of the United States Attorney, Mr. Blasingame, the following colloquy ensued:

> Mr. Rinehart: Right. I feel that at this time we should be able to talk to these witnesses, and that they should be instructed that they should talk to us.
>
> The Court: . . . You have got a right to talk to any witness who wants to talk to you. . . . You can talk to any of them. I will say this you can talk to anybody, period.
>
> When I say "period," I mean there is no limitation.
>
> *And, Mr. Blasingame, you just stay away.*

T. 910–912. (Emphasis supplied).

Appellants' contentions with respect to pre-trial discovery have been based, by and large, on some unfair characterizations of federal criminal procedure. Appellants have stated both to this court and to the court below that their inability to depose prosecution witnesses completely eviscerated their defense because they were never adequately informed of the charges against them and because they could not effectively employ the invaluable tool of cross-examination.

Appellants rightly point out that "[t]here is a tremendous difference in the words stating a crime in an indictment or an information, and the actual facts that a Defendant must meet at the trial of the cause." Appellants' Brief, at 8. However, they go too far when they conclude that this observation compels the taking of depositions. Appellants are ignoring the provision, made in Rule 7(f) of the Federal Rules of Criminal Procedure, for the issuance of a Bill of Particulars, a provision which was incorporated especially to close the information gap that may exist between the facts contained in the indictment and the factual issues which mature at trial.

Appellants also argue that pre-trial depositions are imperative if the defense is to utilize effectively its right to cross-examine the prosecution's witnesses. Again appellants ignore the fact that the Jencks Act, 18 U.S.C. § 3500, permits them to obtain from the prosecution all material statements made to it by its witnesses for purposes of defense cross-examination.

### III.

At one point during the trial, defendant Geders took the stand to testify in his own behalf. After being examined on direct until 4:55 pm, he was tendered for cross-examination. The prosecution moved for a recess at that time in order that cross-examination might be deferred until the following day. The court granted the motion and, after the jury had been withdrawn, it addressed defendant Geders, saying:

> Now, Mr. Geders, will you stand up. I direct you not to discuss your testimony in this case with anyone until you are back here tomorrow morning at 9:30 for the purpose of being cross-examined.

Appellants claim that this order deprived defendant Geders of the assistance of counsel for a sixteen hour period at a crucial stage of the trial in violation of his Sixth Amendment rights. Appellants make no claim of actual prejudice accruing from this deprivation; they argue that they do not have to make such a showing and rely on the authority of United States v. Venuto, 182 F.2d 519 (3rd Cir. 1950), which provides:

> To deprive an accused defendant and his counsel of the right to consult with each other during an eighteen hour court recess was most certainly deprivation of the defendant's constitutional right to consult counsel at all stages of the proceeding. We can find no justification for imposing a restriction of silence between accused and counsel during a trial recess. We

reject the Government contention that defendant and his counsel must prove affirmatively the exact prejudice produced by this injunction in a federal prosecution . . . . "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."

The United States Court of Appeals for the Second Circuit has more recently faced an identical fact situation, however, and it has required the defendant to make some showing of prejudice before the error of the trial court in forbidding lawyer/client consultation for some limited period rises to the status of reversible error.

Leighton's [the defendant's] objection to the ruling of the trial court that he could not consult with his attorney during the luncheon recess is framed in terms of the violation of his right to counsel . . . . At no time during, before, or after the recess, did either Leighton or his attorney indicate that they did in fact have something to discuss which might have affected Leighton's testimony or course of action. Leighton's attorney did object to the judge's ruling, but the objection appears to be an attempt to sow reversible error into the record, rather than an effort to indicate to the trial judge that the attorney and client had something to discuss . . . .

Leighton's reliance upon United States v. Venuto, 182 F.2d 519 (3 Cir. 1950), is misplaced . . . . Its [the ruling forbidding attorney/client communication] application to the defendant was quite plainly uncalled for, and we are unable to understand why it was sought or made as to him. We will not, however, reverse the conviction solely on this ground when we can discern no actual harm to the right of effective assistance of counsel, and are convinced that there was none.

United States v. Leighton, 386 F.2d 822 (2d Cir. 1967).

Because, like the Second Circuit, "we can discern no actual harm . . . and are convinced that there was none," we must reject appellants' contention that defendant Geders' deprivation of the assistance of counsel constitutes reversible error.

We find all other assignments of error raised by appellants to be without merit. The judgment of the district court is therefore affirmed.