**UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,**

v.

**Frank ROMANO and Thomas Romano, Defendants-Appellants, Cross-Appellees.**

**In re UNITED STATES of America, Petitioner.**

**Nos. 81–5710, 82–5114.**

United States Court of Appeals, Eleventh Circuit.

July 19, 1984.

Sidney Glazer, Sara Criscitelli, Atty., Appellate Section, Crim. Div., Washington, D.C., James M. Deichert, Sp. Atty., Dept. of Justice, Atlanta, Ga., for U.S.

Neal R. Sonnett, Benedict P. Kuehne, Bierman, Sonnett, Shohat & Sale, Miami, Fla., for Frank and Thomas Romano.

Terence Anderson, University of Miami School of Law, Coral Gables, Fla., for Judge Hastings.

Before RONEY, HATCHETT and ANDERSON, Circuit Judges.

RONEY, Circuit Judge:

Frank and Thomas Romano, two brothers, were each convicted of 18 counts relating to a series of criminal offenses committed in the course of obtaining and using construction financing to complete a condominium project.[1] We reverse the convictions as to both defendants on the ground that under *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), they were denied effective assistance of counsel when the district court ordered that Thomas Romano refrain from consulting with his attorney concerning his testimony during an overnight recess

---

**1.** These counts charged the defendants with conducting an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); acquiring an interest in an enterprise through the investment of racketeering proceeds in violation of 18 U.S.C. § 1962(a); mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; theft and embezzlement from an employee pension fund in violation of 18 U.S.C. § 644; and making false statements to the Internal Revenue Service in violation of 26 U.S.C. § 7206(1).

which ultimately extended several days due to Thomas's hospitalization for heart problems. So that this reversal will not constitute an impediment to a new trial, we note that we would affirm the district court's rulings that the indictment was not unduly complex or multiplicitous, and that the evidence was sufficient to support the convictions. We need not reach the questions of the propriety of the use of Thomas Romano's videotaped testimony, or the correctness of the district court's final order of forfeiture.

In *Geders v. United States*, 425 U.S. 80, 88, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976), the Supreme Court held that sequestration orders as to criminal defendant witnesses contravene the Sixth Amendment entitlement to the effective assistance of counsel. The Court reversed a defendant's conviction on the ground that the trial court's order forbidding defendant to consult with his attorney "about anything" during an overnight recess denied defendant the effective assistance of counsel. The Court recognized that a trial judge has broad power to sequester witnesses before, during and after their testimony. It stated the three purposes of sequestration: to restrain witnesses from "tailoring" their testimony to that of earlier witnesses, to aid in detecting less than candid testimony, and to prevent improper influence on the testimony of a witness during a recess of court while that witness is testifying.

The court then discussed the different situation of a person who is both a witness and a defendant on two scores. First, a non-party witness with no stake in the outcome of the trial ordinarily has little to discuss with the trial counsel other than his own testimony. A defendant, on the other hand, must consult with his attorney often during a trial about everything that is going on in the courtroom. Second, since a defendant has a right to be present during the entire trial, he can hear the testimony of other witnesses and discuss his testimony with his lawyer up to the time he takes the witness stand. In effect, it would seem that the only purpose that could be accomplished by the rule as applied to a defendant is to preclude improper "coaching" of

the witness by counsel during a recess of his testimony.

The court then discussed the need for a defendant to talk to his attorney during court recess:

> [i]t is common practice during such recesses for an accused and counsel to discuss the events of the day's trial. Such recesses are often times of intensive work, with tactical decisions to be made and strategies to be reviewed. The lawyer may need to obtain from his client information made relevant by the day's testimony, or he may need to pursue inquiry along lines not fully explored earlier. At the very least, the overnight recess during trial gives the defendant a chance to discuss with counsel the significance of the day's events. Our cases recognize that the role of counsel is important precisely because ordinarily a defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance.

425 U.S. at 88, 96 S.Ct. at 1335. Balancing the defendant's right to consult with counsel against the prosecutor's desire to cross-examine the defendant without the risk of improper "coaching", the court resolved the conflict in favor of the defendant.

This Court had decided the issue in favor of the Government on Geders' appeal to us, holding that there was no reversible error in such a restraint on defendant's counsel absent some showing of prejudice. *See United States v. Fink*, 502 F.2d 1 (5th Cir.1974), *rev'd sub nom. Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). After the Supreme Court's reversal of our decision, however, we explicitly agreed that "to the extent that the goal of preventing potential improper coaching conflicts with a defendant's right to freely consult with counsel ... 'the conflict must, under the Sixth Amendment, be resolved in favor of the right to the assistance and guidance of counsel.'" *United States v. Conway*, 632 F.2d 641, 644 (5th Cir.1980). In *Conway*,

the *Geders* rule was extended to all court recesses regardless of how brief.

The facts in this case fall within the *Geders* principle. After several days of trial, on Monday, December 15, 1980, the first day of defendant Thomas Romano's testimony on direct examination, the court recessed at mid-day due to the illness of this defendant. Trial was scheduled to resume on Wednesday, December 17. Throughout the trial, the judge had instructed witnesses whose testimony was interrupted by recesses not to discuss the case with anyone. Over the objection of counsel, the court cautioned Thomas Romano not to discuss his testimony with counsel during the recess. The court stated that the replacement or rescheduling of this defendant's testimony could be discussed, but prohibited any discussion "of any testimony past or future" that Thomas Romano might give.[2] Due to the continuing infirmity of this defendant, the recess lasted five days. The question, of course, is whether the trial judge's instruction was proper in this context. The Government contends that the prohibition in this case

should not be controlled by *Geders* because the court limited its instruction to consultation about Thomas Romano's testimony, leaving room for discussion of other matters in connection with the case, including the state of the defendant's health.

No case has been cited to us which ruled on a situation where the court said the attorney could talk to the defendant, but not about his testimony, under circumstances such as these. In one case the Third Circuit reversed judgment on whether a partial rather than a total prohibition similar to the one here at issue should be distinguished from *Geders*. *Bailey v. Redman*, 657 F.2d 21, 23 n. 3 (3d Cir.1981).

Our review of *Geders* and its progeny indicates that the order here at issue cannot be upheld. *First*, the *Geders* rule has been rather strictly applied. In *United States v. Conway*, 632 F.2d 641 (5th Cir. 1980), this Court held that a sequestration order issued to a defendant witness during a lunch recess which interrupted his cross-examination constituted grounds for reversal of his conviction under the rationale of

---

**2.** The transcript of the colloquy is set forth below:

MR. CURRAN (DEFENSE COUNSEL):
Does the sequestration rule apply to the defendant? He is going to be on and off here so much.
THE COURT:
Once he has given his testimony and the same reasons, due to the defendant witnesses, I am cautioning you not to discuss his testimony with him.
I certainly don't mean that you can't discuss with him the nature of his physical problem and what if any report he received from his physician, but as to any testimony past or future that he may give, I instruct you not to discuss that with him at this point.
MR. CURRAN:
I have to make an objection I think on the record. I am not sure in my own mind of the legal ramifications of not being allowed to talk to my client.
I can understand not being able to talk to witnesses, but with regard to my client, I should be able to talk to him.
THE COURT:
Not about his testimony, but you will have an opportunity to assist in replacing him and to rescheduling and that is not the intent. What happens is, he is on the witness stand and he is just as much a part of the sequestration as

would be the Government's witnesses, their clients, so to speak. Their star witness, and [w]hat have you. But I won't permit you to discuss his testimony with him.
MR. DEICHERT (PROSECUTOR):
If he needs to have attorney client type of discussions that would not be the case. I just want to make it understood, because I recall—I think it was the 5th Circuit or the Supreme Court, where they barred conversations with the witness overnight, and it was—
THE COURT:
Well, as to any testimony he has given, or might give that he is instructed not to talk about it as to attorney client matters, not to this case.
MR. DEICHERT:
He can talk to him about other areas other than reviewing or the anticipated testimony. If he wants to go into anticipated testimony then—
THE COURT:
Well—we have gotten down to the last days of this trial and if you have been reviewing this for 3 years and Mr. Romano doesn't know what this case is about by now, then I am not so sure that any of us do.
I will stand on the ruling that you are not [to] discuss the testimony but you may talk with your client.

*Geders. See also Stubbs v. Bordenkircher*, 689 F.2d 1205 (4th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983) ("any restriction upon a defendant's access to his counsel during a recess, whether the recess be extended or brief, is constitutionally impermissible."); *United States v. Bryant*, 545 F.2d 1035 (6th Cir.1976) (order directing defendant not to converse with anyone during a one-hour lunch break during direct examination held to be a violation of Sixth Amendment right to counsel); *United States v. Allen*, 542 F.2d 630 (4th Cir.1976), *cert. denied*, 430 U.S. 908, 97 S.Ct. 1179, 51 L.Ed.2d 584 (1977) (holding that "a restriction on a defendant's right to consult with his attorney during a brief routine recess is constitutionally impermissible," and reversing the conviction of a co-defendant witness ordered not to talk to her lawyer during an overnight recess); *United States v. Vesaas*, 586 F.2d 101, 102 n. 2 (8th Cir.1978) (expressing in dicta the court's "grave doubts that even a brief restriction on a criminal defendant's right to confer with counsel can be squared with the Sixth Amendment"). In all of these cases, the courts prohibited attorney-client discussion on any subject.

*Second,* in considering other ways to deal with the problem of possible "coaching", the Supreme Court did not suggest a modified restriction. The *Geders* Court thought that proper cross-examination could reveal improper "coaching", that the judge could direct continued interrogation without interruption, that the judge might arrange the sequence of testimony so that cross-examination of a witness could be completed without interruption, and suggested there were a variety of ways of serving the purpose of sequestration "without placing a sustained barrier to communication between a defendant and his lawyer." Our own Court, noting that "attorneys are duty bound not to engage in the type of activity feared by" a trial court, agreed that the trial judge can take steps to alleviate potential harm. It did not indicate that a restricted prohibition against talking with a defendant about his testimony was a possibility. To the extent a conflict remains after the suggested measures are utilized, however, the Sixth Amendment right to counsel prevails. *United States v. Conway*, 632 F.2d at 644–45 (citing *Geders*, 425 U.S. at 91, 96 S.Ct. at 1336.).

*Third,* forbidding discussion of Thomas Romano's testimony rendered his right to freely consult with counsel meaningless in the context of this case. In *Potashnick v. Port City Construction Co.*, 609 F.2d 1101 (5th Cir.1980), a civil case, we held that the court's prohibition of consultation between a party witness and his attorney during a recess extending over a seven-day period violated the litigant's due process right to retain counsel, and noted that "[a]t the very least, the overnight recess during trial gives the defendant a chance to discuss with counsel the significance of the day's events." 609 F.2d at 1118 (citing *Geders*, 425 U.S. at 88, 96 S.Ct. at 1335). Both this case and *Conway* accorded great weight to the principle that a litigant "requires the guiding hand of counsel at every step in the proceedings against him". *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S.Ct. 55, 63–64, 77 L.Ed. 158 (1932). Neither opinion intimated that the ruling might have been different had the prohibition involved been restricted only to discussion of the testimony of the party witness.

Having determined that the rule of *Geders* does apply to this case, we turn to the question of whether the trial court's admonition constitutes reversible error. Some courts have found violations of the *Geders* principle to be harmless error. Those courts which have deemed *Geders* errors harmless have articulated different criteria in making their determinations. The Second Circuit, for example, has held that a trial court's admonition to a defendant witness forbidding him to confer with his attorney during a five-minute recess was not reversible error where there was "not even, a remote risk of actual prejudice." *United States v. DiLapi*, 651 F.2d 140, 148 (2d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1428, 71 L.Ed.2d 648 (1982). The

court noted that counsel's objection to the prohibition included no mention of any matter requiring consultation, and that the defendant did not request consultation.

The Third and Fourth Circuits have formulated a test for determining whether a *Geders* violation constitutes reversible error. In *Bailey v. Redman*, 657 F.2d 21, 24 (3d Cir.1981), *cert. denied*, 454 U.S. 1153, 102 S.Ct. 1024, 71 L.Ed.2d 310 (1982), and *Stubbs v. Bordenkircher*, 689 F.2d at 1207, these circuits held that sequestration orders imposed upon criminal defendant witnesses were error, but affirmed the convictions nonetheless on grounds that the petitioners had failed to show that they actually desired to meet with their respective attorneys, but were prevented from doing so by the instructions of the trial judges. Both opinions stressed that

> [while it] is one thing to say that a defendant who has been deprived of the guiding hand of counsel need not demonstrate the prejudicial effect of that deprivation, it is quite another to say that he need not show that the challenged order deprived him of counsel he would otherwise have received.

*Bailey*, 657 F.2d at 24; *Stubbs*, 689 F.2d at 1207.

The Sixth Circuit has simply noted that "in the absence of extraordinary circumstances, ... it is an abuse of discretion and a violation of the right of a defendant to assistance of counsel for a trial court to direct that the defendant have no communication with his counsel during a criminal trial." *Bryant*, 545 F.2d at 1036.

Contrary to the language in some of these cases from other circuits, this Court appeared to conclude in *United States v. Conway* that the *Geders* violation was reversible error without any reference to possible prejudice. At least no inquiry along the lines outlined above was made in the opinion in that case.

■ We need not decide whether the Government might be able to demonstrate a lack of prejudice to the point of harmlessness in a given case. Our review of the record before us indicates that the error in this case cannot be deemed harmless. The denial of Thomas Romano's Sixth Amendment right to the effective assistance of counsel occurred under circumstances which decidedly reflect an actual "deprivation." The sequestration order was entered over defense counsel's objection, and inevitably constrained counsel in assessing the options available to his two clients. The length and circumstances of the recess exacerbated the extent of the deprivation here. Attorney-client discussion of the case and of the strategy for the remainder of the trial was undoubtedly hampered by the admonition against discussion of the testimony of the hospitalized defendant witness. Thomas Romano's conviction must be reversed.

■ The remaining question is whether Frank Romano's conviction must also be reversed. Only one case cited to this Court involved the claim of a co-defendant on these grounds, and in that case, the Sixth Circuit refused to reverse the co-defendant's conviction. *See United States v. Bryant*, 545 F.2d 1035 (6th Cir.1976). The facts of that case, however, differ significantly from those in the case before us. Here, the two co-defendants are brothers who were indicted together on charges based on a series of complex business transactions in which they played substantial and interrelated roles. Information concerning these ventures was undoubtedly shared. Thomas was the key witness for both defendants. The record reflects that the Romanos' entire defense hinged upon Thomas's testimony explaining why no fraud was committed. Prohibiting the attorney who represented the brothers from discussion of any of the past or future testimony of Thomas during the five-day period of that defendant's hospitalization was equivalent to prohibiting discussion of any aspect of the case. Thomas's testimony, and the corresponding restriction on attorney-client consultation, were necessarily critical to Frank's case. It is hard to conceive of how the attorney could, without breaching the court's admonition, discuss with his clients the options and

tactics available in light of the possibility that Thomas might not be able to finish his testimony. Issues such as whether Thomas's ability to testify as completely as originally planned or to withstand cross-examination might be affected by his physical condition, or whether Frank should assume a more substantial testimonial role are just two of the many possible problems of defense presented by the illness of such a key party witness. For these reasons, we hold that the erroneous admonition preventing discussion between Thomas and his attorney regarding Thomas's testimony requires that Frank's conviction be reversed. This holding is based upon the special facts of this case, and by no means implies that a co-defendant's conviction typically will be reversed on *Geders* grounds.

We turn now to the question of the sufficiency of the evidence. The defendants identify four areas in which the evidence was allegedly insufficient. Specifically, they contend (1) the Government failed to prove the existence of criminal intent or any scheme to defraud; (2) the theft and embezzlement convictions were invalid because the Romanos were lawfully entitled to the subject property; (3) the Government failed to show the defendants conducted an enterprise through a pattern of racketeering activity; and (4) there was no showing of an intent to defraud on income tax returns.

A reversal for insufficient evidence would preclude a retrial. *Hudson v. Louisiana,* 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). To determine whether the evidence is sufficient to support the guilty verdict, we must view it in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 689 (1942), and all credibility choices must be made in support of the verdict, *United States v. Black,* 497 F.2d 1039 (5th Cir.1974). Using these criteria, the evidence against both Thomas and Frank Romano is sufficient to sustain their respective convictions.

The Government presented proof on the mail and wire fraud counts which supported the jury finding that defendants defrauded Kane and I.O.T.A. Industries, Inc. (IOTA) of the opportunity to recover a return on their original investments in the Executive House condominium project. Fraud may be accomplished by willful concealment or omission of material facts, or by intentional statements of half-truths. Testimony at trial indicated that Thomas Romano withheld information that a construction loan had been obtained for the Executive House project, with the consequence that Kane believed himself to be "facing financial ruin and possible personal bankruptcy," and opted to abandon the project to the Romanos. He surrendered his interest in return for a release from liability on the mortgage. IOTA was likewise led to believe that Executive House was a failing business. There was evidence that the defendants were responsible for forwarding to IOTA an unfavorable financial statement which projected continuing operating loss for the Executive House, as well as a copy of a letter from the mortgagor with a cover letter which similarly portrayed the prospects and failed to mention the 4.7 million dollar loan commitment. IOTA subsequently abandoned the Executive House project.

The other fraud allegations concerned the defendants' receipt of construction funds. The defendants contend that there was insufficient evidence of mail and wire fraud because they were entitled to the monies they received from the Pension Fund since, as borrowers of the loans, they were ultimately responsible for repayment. This argument ignores the fact that the loans were expressly made to cover the costs of construction, and not as personal advances to the Romanos. The record reflects that there were ample grounds to support the jury's conclusion that the defendants were guilty of fraud in connection with their use of the loan funds designated in the loan agreement as monies to be used to finance actual construction costs.

The Government's evidence showed that the defendants deposited the Pension Fund's $72,800 cash contribution into their

.own account; withdrew $558,000 from the first construction draw and deposited it into their joint personal checking account; and submitted 50 false releases of liens in their applications for construction draws. These releases bore the forged signatures of nonexistent subcontractors. Defendants cashed the checks written by the Fund to the nonexistent payees, telling the bank that they were cashing the checks as a favor to the payees. They specifically declined to personally endorse the checks but deposited the proceeds in their own safe deposit box. A similar sequence of events occurred following the Pension Fund's approval of a second loan for 1.8 million dollars. The Government's evidence indicated that defendants used $698,091 to pay off the mortgage, and cashed eight checks totalling $75,000 which were made out to fictitious subcontractors. The stated purpose of the second loan was to finance the conversion of Executive House into a rental project and to purchase additional land for tennis courts.

The fraud count also encompassed the alleged misrepresentations made by the defendants to the Pension Fund in their loan application. Defendants' contention that there was no misrepresentation could reasonably have been rejected by the jury in light of Government evidence showing that defendants submitted a schedule of expenditures which itemized particular costs totalling $728,785. Defendants argue that there was no misrepresentation because this figure represented their equity in the project. There is no doubt, however, that the jury could reasonably have concluded that defendants deliberately led the Pension Fund to believe that they had expended this amount in out-of-pocket expenses in an effort to persuade the Fund to contribute $72,800 as its initial 10 percent cash payment on the loan. The Government's evidence indicated that the defendants deposited that contribution into their own account, and obtained $540,000 based upon forged subcontractor checks which they used to withdraw funds from the escrow account in which the loan installments were deposited by the Fund. While Thomas Romano testified that he had informed the Fund about the circumstances surrounding these withdrawals, the trustees' minutes and the testimony of the Fund's representatives showed that the Fund was not notified of the defendants' activities.

■ Defendants claim that there was insufficient evidence to support their convictions for theft and embezzlement because the testimony established that they were lawfully entitled to the subject property. Specifically, they argue that because the Pension Fund authorized them to receive money in construction draws during the work on Executive House, and because ultimately, the full amount of the loan would be, and was, given to them, "[t]heir periodic receipt of small amounts of money from individual construction draws was fully consistent with their understanding of the loan agreement, and was designed ... to protect the Pension Fund's assets against unscrupulous subcontractors who would seek to inflate their expenses" if they were aware that the full amount of the construction loan funds was not being utilized.

The Government produced evidence, including the documents underlying the construction loan, however, which indicated that the defendants' appropriation of a portion of the funds designated to be used for construction expenses was clearly outside the terms of the agreement. The defendants' contention that they were entitled to recover their "equity" from the loan disbursements is at odds with the terms of the mortgage agreement, and the testimony of the Pension Fund trustees at trial indicated that it was agreed that the initial investments of the parties would be recovered from the profits of Executive House after it was in operation. Defendants' real estate attorney likewise testified that according to the agreement, reimbursement of the initial investment would be paid out of the first condominium profits.

Defendants further contend that the Government failed to demonstrate the existence of an enterprise which affects interstate commerce, a necessary element of conviction for RICO violations under 18

U.S.C.A. § 1962(c). *United States v. Hartley*, 678 F.2d 961, 987 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). They claim there was no evidence to show that an ongoing and continuing enterprise existed apart from the alleged fraudulent activities.

■ A review of the evidence shows the jury could have concluded that the Romanos constituted a two-person "entity ... associated together for a common purpose of engaging in a course of conduct" and that they were in fact "an ongoing organization ... that ... function[ed] as a continuing unit". *See United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). In view of their previous years of business partnership, their joint bank accounts and safe deposit box, their joint investments, and their close personal and familial relationship, the jury conviction under the RICO statute requiring that there be an ongoing enterprise was justified.

■ Defendants' contention that RICO is designed to apply only to organized crime participants is without merit. Several circuits have explicitly rejected this theory. *See e.g., United States v. Bledsoe*, 674 F.2d 647, 663 (8th Cir.1982), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1983), and cases cited therein. Moreover, this Circuit has affirmed RICO convictions of persons not identified as members of an organized crime syndicate. *See e.g., United States v. Hartley*, 678 F.2d 961 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983).

■ Defendants also argue that they were not shown to have intentionally acted to deceive the Government in their tax reporting activities. The tax counts related to the defendants' failure to declare as income the $72,800, representing the Pension Fund's initial cash contribution on the construction loan which they appropriated, and the $558,000 they withdrew from the first draw on the construction loan on their 1974 tax returns, as well as their failure to declare the $540,000 generated via the fictitious subcontractor checks on their 1975 returns and applications for tentative refunds. Defendants characterized these sums as "loans" on their returns, rendering them exempt from taxes.

There was evidence that the accountants who prepared the returns relied upon the defendants' representations as to the nature of these funds. There was no evidence that defendants intended to repay these sums at the time that they claimed them as "loans." Rather, they have contended that these monies were reimbursements for their original investment, or "equity" in the project. The fact that the defendants failed to declare their release from liability on these monies as income on their tax returns when the loans were taken off the books supports the theory that the defendants intended to avoid paying taxes on the money, and supports the jury's conviction of the two on tax violation counts.

■ The defendants challenge the indictment on grounds that it was multiplicitous and unduly complex. Our review of the document, however, reveals no such defects. The charges are plainly stated, and are set forth in a comprehensive manner. The length and complexity of the instrument are necessitated by the nature of the crimes charged, and do not preclude it from satisfying the requirement of Fed. R.Crim.P. 7(c)(1) that it be "a plain, concise and definite written statement of the essential facts constituting the offense charged." *See Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (the indictment must (1) contain the elements of the offense and fairly inform the defendant of the pending charges, and (2) enable the defendant to plead acquittal or conviction to bar any future prosecution for the same offense); *United States v. L'Hoste*, 609 F.2d 796, 800 (5th Cir.1980).

■ Defendants' contention that the indictment improperly charged a single offense, conspiracy, in more than one count is likewise without merit. The two counts at issue charge two different frauds which allegedly occurred at different times, and involved different predicate acts. Separate proof was required for each. The fact that each was the product of an enterprise in-

volving both defendants is not in itself sufficient to demonstrate that the defendants were subject to conviction for the same crime twice in violation of double jeopardy principles. Furthermore, defendants failed to raise this objection in their pretrial challenge to the indictment as required by Fed. R.Crim.P. 12(b)(2). Under Fed.R.Crim.P. 12(f), this ordinarily constitutes a waiver precluding preservation of the claim on appeal.

Because we need not consider the propriety of the forfeiture order, the Government's petition for writ of mandamus is DISMISSED.

The defendants' motion requesting disqualification or recusal by judges of the Eleventh Circuit in this action is DENIED. The motion is based upon the claimed appearance of conflict of interest resulting from the Judicial Council's investigation of a complaint lodged against the district judge arising from his disposition of the forfeiture issue in this case. The charges leveled, however, do not pertain directly to the issues before us, and do not affect the arguments of either party, or our disposition of this case. The alleged appearance of conflict of interest is, if extant at all, insubstantial.

REVERSED.