In re Richard GITELMAN, Barbara Gitelman, Debtors.

EUROPEAN AMERICAN BANK, Plaintiff,

v.

Richard GITELMAN and Barbara Gitelman, his wife, Defendants.

Bankruptcy No. 86–01572–SMW–BKC.
Adv. No. 86–0581–BKC–SMW–A.

United States Bankruptcy Court, S.D. Florida.

June 8, 1987.

Frank J. Heston, Coral Springs, Fla., for debtors.

Jack F. Weins, Hollywood, Fla., for trustee.

Julian H. Kreeger, Miami, Fla., for plaintiff EAB.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDNEY M. WEAVER, Bankruptcy Judge.

THIS CAUSE came before the Court upon a Complaint filed pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B), and 11 U.S.C. § 727 to except from discharge the debts and obligations of Richard Gitelman and Barbara Gitelman (the "debtors"), and the Court, having heard the testimony and examined the evidence presented, observed the candor and demeanor of the witnesses, considered the arguments of counsel, and being otherwise fully advised in the premises, does hereby make the following findings of fact and conclusions of law:

The Debtors transacted business through various corporate entities including Richard Gitelman Enterprises, Ltd. ("Gitelman Enterprises"), Asher Galleries, and Ascot Advertising. Although the debtors filed a joint individual petition, they acknowledge that they commingled personal and corporate assets and liabilities because they were unsure whether their various corporations were in existence at the time of the commencement of these proceedings.

In 1975 Richard Gitelman formed Richard Gitelman Enterprises, a New York Corporation. Gitelman Enterprises was engaged in the business of selling inexpensive original oil paintings for approximately eight (8) years. Over the years, Gitelman Enterprises developed a banking relationship with European American Bank ("EAB") where the corporation obtained a revolving line of credit which was to be paid down or "cleaned up" in the spring of each year. The debtors bolstered EAB's confidence in Gitelman Enterprises by paying down the line of credit each year as required and furnishing periodic financial statements prepared, on a "review basis", by an accountant known to EAB. In addition, the debtors showed a level of officer/shareholder loans and equity sufficient to lead EAB to believe that the debtors had a significant investment in the company, which investment debtor Richard Gitelman agreed to subordinate to EAB's loans. The financial statements also indicated that Gitelman Enterprises had substantial accounts receivable. The debtors gave EAB personal financial statements, personal guarantees, and a written promise from Richard Gitelman that the debtors would not further encumber their New York home. This promise was subsequently orally renewed by Richard Gitelman and his accountant.

By the foregoing, Gitelman Enterprises, a seemingly healthy business, was able to build up its line of credit with EAB to total $500,000.00. In reality, however, the debtors' actions and interim financial statements created an artificial facade which concealed an empty shell, a facade which gave EAB a false sense of security and induced EAB to renew and increase Gitelman Enterprises' line of credit.

In 1981 Richard Gitelman temporarily increased his officer loan so that an artificially high officer's loan was shown on the June 30, 1981 interim financial statement. Richard Gitelman withdrew the money from the corporation in July, 1981. The

June 30th corporate financial statement was then delivered to EAB in August, 1981 without disclosing the withdrawal from Gitelman's officer's loan. Both Richard and Barbara Gitelman also signed a personal financial statement in which they falsely listed ownership of stock in Mirtan Corporation, a corporation owned by Barbara Gitelman's uncle. Based upon the above actions by the debtors, EAB renewed and increased the line of credit in the summer of 1981.

Richard Gitelman knew that EAB expected him to keep a certain amount of dollars in his business if EAB was going to continue to lend him money. In October, 1981, Richard Gitelman signed a subordination agreement in which he falsely represented the amount of his officer's loan to be the amount shown on the June 30, 1981 statement. Richard Gitelman also gave EAB a letter in which he pledged not to further encumber the debtors' New York house, which was the debtors' principal asset apart from their investment in Gitelman Enterprises. This gave EAB continuing assurance that debtors would continue to have sufficient personal net worth to make their personal guarantees meaningful.

In the spring of 1982, the debtors knew that EAB would be looking for repayment of its outstanding line of credit as well as receipt of financial statements and Federal Income Tax returns for the fiscal year ending September 30, 1981 before EAB would renew or extend Gitelman Enterprises' line of credit. The debtors also knew that the fiscal year end financial statement and tax return would enable EAB to discover that Richard Gitelman had withdrawn money from the officer's loan account in violation of his representations and subordination agreement. Therefore, in May, 1982, debtors arranged a secret $378,000.00 loan to Gitelman Enterprises from General Zipper Corporation, a corporation owned and/or controlled by Barbara Gitelman's uncle. The loan was made through a series of 14 checks of varying amounts which were deposited to the Gitelman Enterprises bank account at EAB. No explanation was offered as to why so many checks in varying amounts were received from General Zip-

per or why multiple checks in varying amounts were written on the very same day by General Zipper.

The General Zipper loan was used to make the annual pay-down of EAB's line of credit but the loan was not disclosed to EAB. Instead, Richard Gitelman misled EAB by telling EAB that he had replenished (and increased) his officer loan and that the replenished loan would be reflected on the June 30, 1982 interim financial statement. At this time, the debtors also gave EAB a personal financial statement as of December 31, 1981 and signed by both Richard and Barbara Gitelman which materially overstated the amount of Richard Gitelman's officer's loan to Gitelman Enterprises and again falsely listed stock ownership in Mirtan Corporation as an asset.

By "cleaning up" the EAB line of credit in the late spring of 1982, and representing that Richard Gitelman had made substantial investment in Gitelman Enterprises through an officer loan, which was subordinated to EAB, the debtors induced EAB to believe that the corporation had generated sufficient operating revenues to pay down its loans, was in a stable financial condition and that its business was viable. The debtors also led EAB to believe that they had substantial personal net worth, including their house, making their personal guarantees meaningful. In the early summer of 1982, acting in reliance upon what appeared to be a financially stable, viable business, supported by personal guarantees from the debtors who appeared to have a substantial net worth, EAB agreed to again renew and extend the revolving line of credit to approximately $500,000.00 for working capital.

Richard Gitelman then drew down almost the entire line of credit. Although Richard Gitelman understood that the loans were to be used for the purpose of providing working capital, $296,000.00 of these funds were used to repay the undisclosed General Zipper loans. The payments were inconspicuously made through a series of relatively small checks in varying amounts, including several dated the very same day.

In the fall of 1982 the Gitelmans, without informing EAB, placed their New York house on the market and made plans to move to Florida. Also in the fall of 1982, Richard Gitelman gave EAB interim financial statements for the period ending June 30, 1982. The statements were prepared on a "review basis" by the accountant (who was also the accountant for General Zipper) and Richard Gitelman also personally certified the accuracy of the. statements. The $378,000.00 General Zipper loan was not reflected on the statements although it had been a liability of Gitelman Enterprises on June 30, 1982.

EAB subsequently discovered that the June 30, 1982 statements were materially false and misleading in other respects as well. For example, the June 30, 1982 corporate financial statements showed sales of $597,277.00 for nine (9) months. The debtors subsequently filed corporate Federal Income Tax Returns, also prepared by the aforesaid accountant. Which showed sales that for the entire fiscal year totalled only $152,969.00. Similarly, after showing accounts receivable of $669,517.00 as of June 30, 1982, only $113,720.00 was shown on the Federal Income Tax Return as of September 30, 1982. The receivables were not collected, nor were records relating to accounts receivable ever produced or an explanation given for the discrepancies. Additionally, Richard Gitelman admitted during these proceedings that the accounts receivable did not exceed $300,000.00 at any time after 1981. The June 30, 1982 financial statements represented the officers' loan as being $250,000. when it was no more than $56,000.00 according to the testimony of EAB's expert, a certified public accountant. Affiliate debt of $172,-000.00 from Asher Galleries was misleadingly concealed as if it were a trade receivable. Asher Galleries' 1982 Federal Income Tax Return, signed by Barbara Gitelman, reflected that Asher Galleries had no net worth.

During the fall and winter of 1982, Richard Gitelman and his accountant continued to give EAB false assurances that Gitelman Enterprises was a viable business, that the debtors intended to keep operating the business and that the debtors would not further encumber their home. At no time was EAB told that the debtors were selling their New York home, or that debtors had borrowed money from Barbara Gitelman's uncle to make a down payment on a Florida home during the spring of 1983. In September, 1983, the debtors purchased a Florida house and moved to Florida without telling EAB or other creditors until this proceeding was commenced. Barbara Gitelman's uncle helped to conceal information as to debtors' new address when he omitted requested information in his sworn response to a Garnishment Subpoena in a New York proceeding commenced by EAB, despite the fact that the uncle had financed the Florida house and his corporation, Mirtan Corporation, held a recorded mortgage on the house. By so doing, the debtors managed to avoid EAB until they filed their bankruptcy petition in 1986.

EAB contends that the foregoing facts are sufficient to except the debtors' obligation to EAB under 11 U.S.C. § 523. This Court has held that exceptions to discharge are to be strictly and narrowly construed. To sustain its claim, an objector to the discharge of a debt must sustain its burden of proof with clear and convincing evidence. *In re Lowinger,* 19 B.R. 853 (Bkrtcy.S.D.Fla.1982). EAB has carried its burdens in this regard.

To except the debtors' obligations from discharge under 11 U.S.C. § 523(a)(2)(A), EAB has the burden of showing that the debtors had obtained money, or an extension, renewal or refinancing of credit by false pretenses, a false representation or actual fraud (other than a statement respecting the debtors' or an insider's financial condition).

"False pretenses may be a passive posture, an expressed or manifest attitude which is assumed to mislead the damaged party; it may be a mute charade to express the attitude; it may be conduct designed to convey an impression without oral expression." *Matter of Thomas,* 12 B.R. 765 (Bkrtcy.N.D.Ga.1981) at p. 769 in footnote 9.

In order to preclude the discharge of a particular debt because of a debtor's false representation, a creditor must prove that:

"the debtor made a false representation with the purpose and intention of deceiving the creditor; the creditor relied on such representation; his reliance was reasonably founded; and the creditor sustained a loss as a result of the representation." *In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986)

■ Fraud may also be accomplished by willful concealment or omission of material facts, or by intentional statements of half-truths. *United States v. Romano,* 736 F.2d 1432 (11th Cir.1984); *vacated on other grounds* 755 F.2d 1401 (11th Cir.1985).

EAB's expert testified that he considered the false representations and misleading financial statements to have been a deliberate attempt by the debtors to deceive EAB. The Court having observed the demeanor of debtors further finds that their testimony lacked credibility and the testimony of EAB's representatives and expert witness to be credible. Furthermore, while intent may not be presumed, it may be inferred from the "totality of the circumstances". See *Matter of Kinney,* 54 B.R. 348, 352 (Bkrtcy.M.D.Fla.1985).

The Court finds that the debtors knowingly made a continuous series of fraudulent representations to EAB both regarding the amount of Richard Gitelman's investment in Gitelman Enterprises and the economic viability of the business. These false representations induced EAB to ultimately renew and increase Gitelman Enterprises' line of credit to $500,000.00. The failure to disclose the temporary General Zipper loan to EAB, and use of a line of credit given for working capital to repay the undisclosed General Zipper loan were part of an ongoing scheme by debtors to deceive EAB and constituted actual fraud. EAB acted reasonably in relying upon the representations of a respected and established customer. EAB was damaged by its reliance upon the debtors' representations. Each fraudulent representation was continuous from the date each loan was made and remained actionable by EAB until it received notice to the contrary. *See Matter of Pappas,* 661 F.2d 82 (7th Cir.1981).

The full extent of the debtors' fraud upon EAB cannot be determined because debtors failed to produce sufficient financial books and records from which their financial and business transactions could be fully ascertained. The record nevertheless shows abundant evidence of false pretenses, false representations and actual fraud, in that the debtors consistently deceived EAB and induced EAB to extend loans to Gitelman Enterprises, by giving false and misleading information, oral and written, as to the financial condition of Gitelman Enterprises, and the amount of debtors' investment in the corporation. The false representations and fraud extend to the entire amount of EAB's claim.

■ It should be noted that it is not necessary, under 11 U.S.C. § 523(a)(2), that the property be actually procured for the debtor himself. Furthermore, an officer, director or shareholder of a corporation will not be shielded by the corporate form from liability for a tort, including fraud, in which he himself is involved. *See In re Firestone,* 26 B.R. 706, 714 (Bkrtcy.S.D. Fla.1982). EAB is therefore entitled to exception from discharge under 11 U.S.C. § 523(a)(2)(A).

To except a debt from discharge under § 523(a)(2)(B), a creditor must show that debtors obtained "money ... or an extension ..." by use of a statement in writing (i) that was materially false; (ii) respecting the debtors' (or insiders') financial condition; (iii) on which EAB reasonably relied; (iv) and that debtors caused the statement to be made with intent to deceive.

■ Barbara Gitelman and Richard Gitelman induced EAB to renew and extend the entire line of credit to Gitelman Enterprises by giving EAB a statement in writing, signed by both Barbara Gitelman and Richard Gitelman that was materially false as to the amount of Richard Gitelman's officer's loan and ownership of Mirtan stock. EAB's reliance was reasonable because of the apparent dealing with a customer of long standing coupled with sub-

mission of statements prepared by an accountant known to EAB. In addition, the numerous material false statements in the various other financial statements amount to overwhelming evidence of an ongoing intent by debtors to deceive and defraud EAB. This type of intent is rarely proven by direct evidence. Instead, it is usually inferred from the fact and circumstances of debtors' conduct. *First Texas Saving Association v. Reed,* 700 F.2d 986, 990 (5th Cir.1983). *In re Kaiser,* 722 F.2d 1574, 1582 (2d Cir.1983). *In re Tveten,* 70 B.R. 529, 532 (Bkrtcy.D.Minn.1987). EAB is therefore also entitled to exception from discharge under 11 U.S.C. § 523(a)(2)(B).

In light of the foregoing, it is not necessary for the Court to reach the issues raised by EAB under 11 U.S.C. § 727.

In summary, the Court concludes that:
1) the debtors obtained money from EAB under false pretenses, false representations and actual fraud and that EAB is entitled to exception from discharge under 11 U.S.C. § 523(a)(2)(A); and
2) the debtors obtained money from EAB through false financial statements in writing, and that EAB is entitled to exception from discharge under 11 U.S.C. § 523(a)(2)(B);

A separate Final Judgment of even date has been entered in conformity herewith.